# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 21-3820

———————————————

United States of America

*Plaintiff - Appellee*

v.

Raekwon Duprix Webb

*Defendant - Appellant*

————————

Appeal from United States District Court
for the Southern District of Iowa - Central

————————

Submitted: May 9, 2022
Filed: July 5, 2022
[Unpublished]

————————

Before SMITH, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

————————

PER CURIAM.

Raekwon Webb pleaded guilty pursuant to a written plea agreement to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and was sentenced to 60 months' imprisonment. On

appeal, Webb argues that the district court[1] clearly erred in concluding that he used the firearm in the commission of a robbery. *See* U.S.S.G. § 2B3.1 (robbery offense level). We affirm.

## I. *Background*

Webb pleaded guilty pursuant to a written plea agreement to being a felon in possession of a firearm. In that agreement, he acknowledged that he threw a nine-millimeter pistol out of a vehicle's window. He stipulated that the firearm was stolen.

A presentence report (PSR) was prepared. It set forth the offense conduct as follows:

11. On October 19, 2020, Des Moines, Iowa (Des Moines), Police received a call from [T.T.]. [T.T.] stated that a male named Raekwon Duprix Webb robbed him of $500 in cash, and that [T.T.] was currently following Webb in a vehicle. Dispatch told [T.T.] to stop, but he refused and stated, "There is going to be a full-on high-speed chase." [T.T.] went on to state to dispatch that Webb held a gun to [T.T.] and stole money from him. Shortly after [T.T.'s] call, dispatch received another call from a homeowner stating a white vehicle had crashed into his fence at 919 Southeast 11th Street in Des Moines and was stuck in his yard.

12. [Law enforcement] responded to the scene of the crash and located [T.T.] attempting to get a white 2008 Dodge Avenger with no license plates unstuck from a fence. [T.T.'s] sister, [C.T.], was also present. [T.T.] told [law enforcement] that he and his sister had been driving around with Webb. [C.T.], who had a gun permit, possessed a Smith and Wesson nine-millimeter pistol in

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

the vehicle. At some point, they had also picked up Webb's friend, Jamel Carter. While they were riding around, Webb grabbed [C.T.'s] gun, held it to [T.T.], and told [T.T.] to give Webb his money. Webb held the gun on [T.T.] while Carter took the money. After the robbery, the vehicle crashed into the fence, and Webb took off with the gun and the money.

R. Doc. 41, at 6 (emphasis and footnote omitted).

The PSR reported that a few hours after the incident, T.T. again contacted police and reported "that he had contacted Webb and arranged for Webb to return [T.T.'s] property." *Id.* at 7 (emphasis omitted). Webb was expected to take the stolen firearm to C.T.'s apartment. Law enforcement went to the apartment complex and observed a vehicle entering the apartment complex parking lot. The vehicle's occupants saw police, made a u-turn, and sped away. Law enforcement located the vehicle and conducted a traffic stop. The vehicle's driver was Webb's girlfriend. Webb sat in the front passenger seat. Two small children were also in the vehicle. Webb denied having any guns. Thereafter, police retraced the vehicle's route and recovered a nine-millimeter pistol near the entrance to the apartment complex's parking lot. During a post-*Miranda*[2] interview, Webb's girlfriend admitted that Webb threw the pistol out of the vehicle's window while they attempted to elude police.

According to the PSR, in a follow-up interview the next day, T.T. told law enforcement of his belief that he and his sister "were targeted because earlier in the day, he was flashing cash on Snapchat, and he and Webb were 'friends' on Snapchat." *Id.* at 7 (emphasis omitted). T.T. reported to police that he and Webb spoke on the phone after the robbery and that Webb agreed to return C.T.'s pistol. Webb stole the money, according to T.T., "because he had 'mouths to feed.'" *Id.* T.T. asked Webb to return the money, and Webb replied that he had already spent the

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

money. T.T. told police that he became angered by Webb's reply and called police to report Webb's imminent return of the pistol to C.T.'s apartment.

Police then spoke with C.T. "She confirmed [T.T.'s] account of events and also said that Webb took her gun and pointed it at them while Carter went through their pockets and took the money." *Id.* (emphasis omitted). C.T. provided law enforcement with a phone conversation between Webb's girlfriend and T.T. in which the girlfriend told T.T., "This is his girl, I'll make sure you get your stuff back." *Id.*

The PSR calculated a base offense level of 20 because the firearm was used or possessed in a robbery. *See* U.S.S.G. § 2B3.1(a). It applied a five-level enhancement for Webb brandishing or possessing the firearm during a robbery. *See id.* § 2B3.1(b)(2)(C). It also applied a one-level enhancement for Webb taking the firearm. *See id.* § 2B3.1(b)(6). These enhancements increased Webb's offense level to 26. After applying a three-level reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a), (b), the PSR calculated a total offense level of 23.

Webb objected to the allegations that he had robbed T.T. or taken C.T.'s firearm. The government responded by offering several exhibits in support of the PSR's factual assertions: (1) a police report recounting the events of October 19, 2020; (2) excerpts of police video from the evening of October 19, 2020; and (3) federal grand jury testimony of C.T. and T.T. given on November 18, 2020. At sentencing, the government's exhibits were admitted without objection. Webb, by contrast, relied in significant part on state court depositions of C.T. and T.T. taken in April 2021.

The PSR's factual assertions largely matched the police report: First, T.T. reported to police dispatch "that a male named Raekwon had robbed him of $500.00" at gunpoint. R. Doc. 47-1, at 1. Second, T.T. reported that he and his sister, C.T., had been driving around with Webb and, at some point, picked up Webb's friend (later

identified as Carter). T.T. stated that Webb held the gun, while Carter took the money. C.T. told officers that her handgun had been taken. T.T. also told police "that he had been flashing money on Snapchat earlier that day." *Id.* at 2. Third, T.T. confirmed in a subsequent interview that Webb took C.T.'s handgun from her and held the two at gunpoint while Carter went through their pockets and took their money. Finally, C.T. confirmed this same version of events.

The police video confirmed C.T.'s and T.T.'s statements to law enforcement after the vehicle crashed into the fence. For example, C.T. stated, "My brother just got robbed." R. Doc. 47-3, at 1:37. T.T. stated, "They t[ook] my sister's gun." *Id.* at 2:08. But T.T. also made statements that Webb had taken as much as $1,000 and that Webb—not T.T.—had been driving the vehicle prior to the crash. *Id.* at 2:18–2:40.

In his federal grand jury testimony—given less than one month after the incident—T.T. confirmed that Webb took $500 from him. He likewise confirmed that Webb stole C.T.'s gun at the same time. C.T. testified to the grand jury that Webb stole her nine-millimeter pistol.

In April 2021—almost six months after the incident—C.T. and T.T. each gave depositions in state court. By this time, C.T. had recanted. C.T. now claimed that no robbery had occurred. R. Doc. 50, at 12 ("Q. There was no robbery, was there? A. No."). T.T. equivocated. At times, he testified that (1) he could not recall critical details, such as who was driving or anything at all about the incident; (2) he was high at the time; and (3) no robbery occurred. At other times, T.T. maintained that Webb robbed him, although Webb did not put a gun to T.T.'s head. T.T. did acknowledge having reported the robbery to dispatch after his 911 call was played at the deposition.[3]

---

[3]Webb ultimately pleaded guilty in Iowa state court to conspiracy to commit a felony. He agreed that he conspired with Carter to steal $500 from T.T. The plea

The district court concluded that the government established by a preponderance of the evidence that Webb possessed the firearm in connection with a robbery. In support of its factual finding, the court cited the police report, excerpts of police video, and federal grand jury testimony of C.T. and T.T. The court did expressly acknowledge C.T.'s and T.T.'s inconsistent testimony offered in the state case.

After calculating a Guidelines range of 57 to 71 months' imprisonment, the district court reviewed the 18 U.S.C. § 3553(a) factors. The court noted that the offense is "really serious" with "evidence demonstrat[ing] by a preponderance that he took that money by force and that he took that money and he obtained that gun in a manner that creates danger to not only the individuals involved but the community as a large." R. Doc. 66, at 42. The court also cited the danger created when Webb threw the pistol from the vehicle. The court also stated, "It's dangerous to the children that were in the car. It's dangerous to the individuals who are around who might encounter that firearm, and it demonstrates a disregard for the safety of others that is of concern to the Court." *Id.* at 43. Finally, the court was "concerned by aspects of the defendant's criminal history." *Id.* This history included witness tampering and a violent burglary.

The court imposed a sentence of 60 months' imprisonment. The court reviewed the other sentencing calculations available to it, including without the robbery cross-reference, and concluded that it would have imposed the same sentence, noting that "the circumstances surrounding this case are sufficiently dangerous." *Id.* at 45–46.

---

agreement provided that Webb's state sentence would run concurrent with his federal sentence.

## II. *Discussion*

On appeal, Webb argues that the district court clearly erred in finding that he committed a robbery, resulting in application of U.S.S.G. § 2B3.1. In support, Webb relies on the state-court depositions in which T.T. and C.T. gave testimony inconsistent with the police report, excerpts of police video, and federal grand jury testimony of C.T. and T.T.

"When finding sentencing facts, district courts apply a preponderance-of-the-evidence standard." *United States v. Clark*, 932 F.3d 1064, 1066 (8th Cir. 2019). We review for clear error a district court's "factual findings underlying a sentence enhancement." *Id.* (internal quotation marks omitted).

"As a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Nichols v. United States*, 511 U.S. 738, 747 (1994) (internal quotation marks omitted). "In sentencing, 'the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.'" *United States v. Pepper*, 747 F.3d 520, 524 (8th Cir. 2014) (quoting U.S.S.G. § 6A1.3).

We hold that the district court properly relied on the police report, excerpts of police video, and federal grand jury testimony in making its factual finding that Webb committed a robbery by stealing C.T.'s firearm and taking money from T.T. First, "[w]e have repeatedly upheld the consideration of grand jury testimony at sentencing; it has indicia of reliability because it was given under oath and subject to the penalties of perjury." *United States v. Cross*, 888 F.3d 985, 993 (8th Cir. 2018) (internal quotation marks omitted). Second, T.T.'s and C.T.'s "statements [to police], though hearsay, were made under circumstances indicating sufficient reliability," considering that they made them shortly after the incident. *Clark*, 932 F.3d at 1067.

Webb's alternative view of the facts based on C.T.'s and T.T.'s later state deposition testimony is another "permissible view[] of the evidence." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). But "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* Here, the district court credited the version of the incident set forth in the police report, excerpts of police video, and grand jury testimony. Its factual finding based on this evidence is not clearly erroneous.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____